We are next case when all the paper is picked up. All right. Sorry. Mr. Schultz. Thank you. Mr. Schultz. Here I am. Thank you. May it please the court. I have the honor of appearing before the circuit on behalf of the estate of Jody Martindale and her claim against and her husband's claim against Indiana University Health Bloomington Hospital, whom I will refer to in my argument is as the hospital or Bloomington Hospital on a what we have presented as a prime fascia case of a violation of MTALA's stabilization requirement under subsection B and subsection C of the statute. We believe the district court entered summary judgment improperly because plaintiff's medical expert Dr. Schreiber is a general surgeon competent to testify and testified that the manner in which Jody Martindale needed to be stabilized on the day that she presented to the hospital was through a surgical procedure to remove dead and dying bowel. Jody presented to the emergency department. The radiology report indicated that she was suffering from an emergency medical condition at the time that she was at the hospital. The hospital had actual knowledge as required by MTALA because they're the ones who performed the CT scan. The radiologist identified the emergency medical procedure, or excuse me, identified the emergency condition, instructed the emergency room physician to seek a general surgeon consultation. The CT scan showed that she had had a prior gastric bypass procedure and so when the emergency room physician approached the general surgeon who was on call at the hospital, the on-call surgeon simply said, I don't touch gastric bypass patients and instructed the emergency room physician to find who had done the prior gastric bypass procedure. As a result of that, Jody Martindale continued to deteriorate and destabilize because what she was suffering from was dead and dying bowel and the only way to stabilize her prior to transfer was through removing that dead and dying bowel, which the hospital had the capability to perform. I'm sorry, Your Honor, I was going to ask a question. This argument, and indeed much of your brief, doesn't tackle the ground on which the district court decided this case, which is that your client consented to the transfer. You really need to tackle that because that's an alternative under the statute. Making your primary attack on something the district court never said doesn't really help your case. So if you would tackle what the district court did say, that would help us. Certainly, Your Honor. My client, an unsophisticated medical person in the area of medicine, did consent to the transfer because that's what the emergency room physician said needed to But even under subsection C of EMTALA, that's not a word. If you could use real words, that would help us generalists. Why don't you just call it the act? Under the act, the hospital still has an obligation to stabilize within their capability even when they transfer an unstable patient. They have to use... Isn't that a contradiction? It's an oxymoron. They have an obligation to stabilize when they transfer a non-stabilized case, right? Sure. Even when my client signed off, Your Honor, to consent to the transfer, the hospital still is required by the act to use all of its capabilities within the facility and its staff to stabilize her. I don't want to... It's just the nature of the case. We've got to get nitpicky about the statute, don't we? Of course. If a hospital has the capacity to stabilize, can it ever make use, in your view, of the pre-stabilization transfer that is expressly authorized by the statute? That's a bit of pre-stabilization transfer. If you read it... It does. Forget the facts of this case. It does. Okay. So by its terms, it seems to say you can transfer pre-stabilization... But you must, under the act, the hospital must, under the act, use everything within its capacity to stabilize the patient to prevent material deterioration. Okay. Let's rewind like five seconds there. Okay. Must use everything in its capacity, you say, to stabilize. That's where I want to nitpick because I don't see that in the statute. What I see... You got it there? Your Honor, I... Yeah. Okay. So we're in 1395DD, right? Correct. Okay. Go to C2. Correct. Capital A. Appropriate transfer. Okay. So we're talking about the same thing, right? Right. Okay. Within its capacity, which minimizes the risks to the individual's health, but it doesn't say to stabilize. So what I'm interested in is, am I seeing a distinction where there's no difference or where's my reading wrong? Where we believe... And I'll back up, Your Honor. Yeah. Where we believe the district court got wrong was they disregarded Dr. Martin Shriver's affidavit in which he said any competent general surgeon could have performed the removal of the bowel procedure, which is... No. Look, Judge Scudder is asking you a question about the meaning of the statute, not about what a medical expert said. We need to talk about the meaning of the statute. Yeah. Mr. Shultz, you need to speak to, in my judgment, responding to my colleagues. Sure. What minimize the risk is. That's got to be the core, it seems to me, in statutory interpretation as to support the facts you want to get into. So I think you need to speak to what minimizing the risk is with regard to this section of the act. The only way to minimize the risk in this case was to remove the dead and dying bowel. The medical evidence, even from the emergency room physician, was that she was going to continue to deteriorate until that procedure happened, until the dead and dying small bowel was removed. So can I just try to translate what you said? So what you're saying is that on this fact pattern, then, it just so happens that the procedure necessary to, quote, minimize the risk, it just so happens to be the procedure that would have stabilized her. Yes. Okay. Now, is that to say, though, that as a statutory matter, stabilizations required pre-transfer? Forget the facts. Not in every circumstance, Your Honor, but I'm telling that it's wrong. Okay, I got it. So we basically agree on the statutory framework, and then what you're saying is, well, when we start to apply the facts, it just turns out they're one and the same thing here. Right. All right, I got it. And in this instance, at this hospital, it had the capacity to perform the necessary stabilization. The only way to minimize the risk on transfer for this woman at this hospital was for that general surgeon or any other general surgeon at the disposal of the hospital to perform the procedure that needed to happen. So what we have to decide is, does the record evidence support what you just said? The district court reached a contrary conclusion. Right, and we argue that we demonstrated a prima facie case, and the way that the district court reached that conclusion was through respectfully an improper weighing of the evidence, and that really this is a summary judgment standard case that is going along with an EMTALA case that just so happens to be an EMTALA case, but where the district court erred. I wish you would use real English words. Yes, Your Honor. Where the district court got sideways was that it began to weigh the testimony of Dr. Green, the general surgeon who said he couldn't perform this procedure, versus our expert who said any competent general surgeon could have performed this procedure, and under the standards set forth by this court and other courts about what constitutes a prima facie showing of EMTALA violation, failure to stabilize. You really need to listen. Stop using that initialism. Okay. You're going to run out of time. Can I get the benefit of your one more question? Yes, sir. Or answer one more. I have a feeling that what we're going to hear from the other side, and I want to hear your response to this, is your argument really depends upon taking the advantage of what we know from hindsight. In other words, what the facts reveal from what was learned at Community Health, right when it was Dr. Jones, is it? Rosemary Jones. Yeah. Dr. Jones performed the operation and then said, you know what, it really didn't what was going on here didn't implicate the prior surgery. Okay. Now, you take full advantage of that. But that doesn't answer, does it, what Dr. Green knew in real time in Bloomington. Right? That's the way I read the red brief argument as much as anything. Your Honor, we respectfully disagree. Yeah, so why is that wrong, is the question. Why that is wrong is because Dr. Green even testified that if it did not involve the area of the... Sure, but the if doesn't get answered until she gets to Indianapolis. And it could have been answered by a simple laparoscopy at Bloomington Hospital, which we have created a question of fact at the district court stage, which should have precluded summary judgment. But through our, through the testimony of the evidence we have, we've demonstrated we have a viable case. Summary judgment should have been denied. All right, I get it. I get it. Thank you. Thank you. Thank you, Your Honor. Thank you, Your Honor. My name is Jim Whitlatch. Yes, thank you. I represent IU Health Bloomington Hospital. May it please the court, I would like to address those issues and appreciate the court's understanding of what the issue is. This is not an issue about stabilization of the patient. It's an issue, as stated, about the interpretation of the Emergency Medical Treatment and Active Labor Act, which I'll refer to as the act, and how that applies to this situation. The plaintiff, on pages 11 and 12 of their brief, states that the hospital must provide an appropriate medical exam, which they did. They determined that there was an emergency medical condition. And then the plaintiff states in their brief that if the hospital determines that the individual has an emergency medical condition, the hospital must provide for such further examination as may be required to stabilize the patient. That is not what the statute states. The statute states that if the individual has an emergency condition, the hospital determines the individual has an emergency condition, the hospital must provide either, within the capabilities of the hospital, stabilizing treatment, or for the transfer of the individual to another medical facility in accordance with Section C of the act. And that is exactly what happened. And to Judge Scudder's question, the Section C of the act provides that a physician may sign a certification that, important to the last question that was asked, based upon the information available at the time of the transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweighs the increased risk to the individual in that situation. That is what happened in this case. It was not an issue of stabilization. It was an issue of the emergency room physician, based upon the information that he had at the time he was transferred, and the risk of transferring that patient. And you go to the issue of the risk and the problems at the time that they knew, and again, in Judge Scudder's question, we didn't know the situation with the bowel when the patient was at Bloomington Hospital. That was discovered after the surgery, after the patient had been transferred. What we knew at the time of the surgery, which is what was contained in the CT report from the radiologist, and that report, again, not mentioned on page 3 of plaintiff's brief, language is admitted from page 3 of plaintiff's brief, but what that CT report that was provided to the providers at Bloomington Hospital at the time this patient came in was the patient has evidence of a small recurrent sliding hernia that contains some of the suture materials closely associated within the stomach from gastric bypass surgery. The suture material closely associated with the stomach from the gastric bypass surgery. And then in respect to the actual part that's quoted by the plaintiff, the part that's not included by the plaintiff in their quote from the report is that the CT scan showed that a segment was involved in the gastric bypass anastomosis. So what they're saying is that what was evident at the time of this patient being at the hospital based upon the CT report was that this patient had a problem that involved the gastric bypass surgery and there's no question from the parties and there's nothing in the affidavit of anyone else that says that Bloomington Hospital had the capability to deal with somebody that had complications within gastric bypass surgery. Now maybe they should have and the plaintiff makes that argument but as the court well knows the act is not an act that deals with medical malpractice. The act is incorporated to prevent dumping of patients in proper transfers to another facility. So what we look at and what the courts have looked in this issue is most particularly the Muskegee court and the Ramus Cruz case from the in those decisions what the court looked at is what does the facility have the what does the facility typically do in these types of situations. And it's not a question of whether or not they provide the absolute perfect treatment. Mr. Whitlock, are there any regulations that help to disambiguate this phrase within its capacity which minimizes the risk. It certainly is possible to say that only complete treatment minimizes the risk because otherwise there's still some residual risk and it's possible to say which is effectively what the district court said that this means minimizes the risk from the transfer as opposed to from the primary condition. So my question is are there regulations that help us understand which is which. I'm not what I can tell you is that the court's decisions deal with that issue. I'm not as I sit here right now I'm not aware of whether or not the regulations have dealt have you. Does this mean that you've looked and there are none or that you haven't looked. I've looked and I'm not I do not recall there surprising. This is of course a Medicare Medicaid statute and I thought no one had ever accused the responsible department of having insufficient regulations for the Medicare program. Yes there are certainly regulations that deal with the act and the interpretation of the act. There's no question about that. And the case law what the case law states on that is that capacity to provide medical treatment and this is in the Muskie case capacity to provide medical treatment to minimize minimize the risk of transfer should be measured by its standard practices and plaintiff is required to produce evidence that the defendant violate an existing hospital procedure or requirement by failing to insert or take the standards that they were requested to take or is being requested now to minimize it. We have evidence that was supported by all of the I hope you see my my problem when you put a word like statute. It can be read to mean the lowest it can possibly go and in environmental statutes sometimes that's exactly what it means. And in that event no patient could ever be transferred or it could mean reduced to a reasonable level the risks of the transfer itself. It looks like there's room for debate right. But the question I guess for our summary judgment was whether or not there were any factual disputes about that debate. Assuming that you know the meaning of the statute before we can figure out what factual disputes if any are material right now. We haven't been helpful in this case because Mr. Schultz just didn't address these matters in his opening brief and perhaps he's forfeited them. But if we're going to say something about it we we need all the help we can get. So what again the Muskie case what it states is it uses an analysis similar to the analysis of what is an appropriate medical screening and it as you are stating indicates that's an ambiguous terms but then concluded that each hospital determines its own capabilities by establishing a standard procedure which is all the hospital needs to follow to avoid liability under EMTALA. So here the question is under what under the act. I apologize. It seems impossible for some specialists to use English words and I don't know why. It's one of the most important things to understand about appellate advocacy that we're generalists. I apologize. So in conclusion that's our position is that the standard is what the hospital normally does in these cases and in this case the it was testified that this hospital that would not with the prior gastric bypass. Thank you. Your honors. We appreciate your time. Okay. Thank you very much. The case is taken under advisement.